Good morning, everyone. We have one case on today's argument calendar, and it comes in Appeal 24-3163, Alarm Detection Systems and Others v. the Village of Schaumburg. Mr. Goldsmith, nice to see you. In 2016, before the ordinance was adopted, it was possible for alarm signal to be sent from the premises of a commercial account through a central station operator in an alarm company facility to the Northwest Central Dispatch in the time it took me to say this sentence. In fact, in 2016, it was possible to send a signal automatically retransmitted without the intervention of a central station operator instantaneously, and yet the Village adopted an ordinance that totally eviscerated my client's contracts and actually set up a system that was substantially inferior to the system that was in place when central station operators were actually receiving the signal. This really impugns the ability of the Village to adopt an ordinance that is so interfering with our client's business. As we pointed out, and as this Court knows, if a contract is severely impaired or, in this case, obliterated, I think the Court and Energy Reserves called it a total destruction of the contract is not necessary, and yet this was a total destruction of the contract. Mr. Goldsmith, under the Contracts Clause, there has to be substantial impairment, which means you have to have a vested interest in the contract. The evidence here seems to be that the contracts at issue were not renewed, not that they were terminated before the end of the contract. That's not the evidence before this Court. What, and especially in light of the first opinion in this case, where we indicated that there was a distinction, what's your evidence that they were terminated, that's in the record, that they were terminated before the end of the contract? So there's several pieces of evidence. The first one is that all these contracts were automatically renewable. They did not have a fixed termination date unless it was up to the customer to actually terminate the contract. But why do you have a vested interest in contracts in the future that aren't yet renewed? The case law doesn't support that. I disagree. The case law doesn't address the issue of an automatically renewable contract. It generally refers to contracts that have a term. In this case, because of the nature of fire alarm monitoring and the importance of safety to consumers' promises, it's necessary to have a continuative service. And you can't have these contracts terminating and have to go out and find a new provider. As a result, it's in the record that these contracts last decades, and they are rarely terminated, even if there's a new resident of the building in which the fire alarm system is located. So you have a contract that's automatically renewable, and the evidence in the affidavits of Mr. Lubick and Mr. Boniface and the other affiants says that in every case, many of the contracts were terminated before the end of the term. Can I pause you on that, Mr. Goldsmith? Where do you see that in those affidavits? I have them right in front of me. So let me tell you what I think is the most relevant language. Lubick, is it Reedy? Reedy. Reedy, and then Poet? Mm-hmm. Those are the three we're talking about? Yeah, and there's Calderon as well. Okay. Okay. So in the three that I mentioned, there's a paragraph, and the paragraph is the same in all of them. It says, as a result of the implementation of the ordinance, ADS lost all of its business in the village, as well as other alarm service business that was typically bundled with the business. In particular, ADS lost 114 commercial accounts. The question I have is, that could be because they were not renewed. No, I believe, Your Honor, and I can have my card pulled. But it doesn't say that there was an early termination. In the 56.1 statement, it specifically refers to the termination being early, and in many cases... But you have to have evidence supporting the 56.1 statement. Well, there's... I'm sorry. The affidavits are the evidence. But that's the problem. Yeah, it gets circular. So in other words, I have the 56.1 statement here, okay? And the 56.1 statement refers back to the verified complaint, and there's references to these affidavits. But when you try to get to the source of what's the actual evidence of an early termination, I'm setting aside automatic renewals for a minute, okay? It's definitely stated here, but what's the evidence of it? Well, among other things, there were the letters from the customers terminating accounts, and those were done before the end of the term of their firm. Are those referenced in here or somehow in the record? Yes. I'm not saying there's a lot. There were several... What letters said that they were terminating early as opposed to not renewing? I think one was a non-renewal, one was a termination, but the... Where is that in the record? It's in the letters themselves. Yeah, the reason we're asking you this is we've looked for it, and we can't find it. So, I mean... And what we've looked at are what are the summary judgment filings and the verified complaint for some reference to it. And you don't identify a letter that supports an early termination of a contract in your briefing. You're relying on the verified complaint and the affidavits. So I want to make sure I'm not missing something. Even if we have not established early termination, there's no question all the contracts were terminated. And it is in the record that they are automatically renewable. Well, let's talk about that. Are you asking us to carve out a new path from the Supreme Court's opinion in Dodge? What would support any discussion we wanted to undertake about Dodge not covering a situation with automatic renewals? It doesn't matter whether there's an automatic renewal or that they were all terminated. The question is, did that cause a substantial impairment to our rights of contract? And given the fact that these contracts typically were renewed, and whether they were terminated early or not, we lost all our contracts. And the evidence of that is not only— But that comes back to, for a substantial impairment, you have to have a vested right. And if you have an existing contract that is terminated, you have a vested right. But back to Judge Jackson-Kuhme's question, it sounds like you're asking us to go beyond that and say, oh, you also have a vested right if it's automatically renewable and they don't renew, which I don't think the case law supports that. Well, I think that it's clear that the government, in this case, has taken a tact to substantially impair our contractual rights because— but for the ordinance, these contracts would still be in force. And it doesn't matter whether they were early terminated or terminated at the end of the term. The contracts are gone. That's the impairment. We've lost our ability. Not only have we lost the ability to rely on those contracts for continuing service, we've lost the ability to get any other business in the village, which is also evidenced in the affidavits, that, as a result, we've lost all our business in the village of Schaumburg. And that's a severe impairment to our relationships. Can we move, then, to your tortious interference with prospective economic advantage claim? Let's assume you're correct on the impact of the village's ordinance on your clients' companies, and let's assume the response times didn't actually improve and the alarms continued to malfunction at the same or higher rate. So everything the village said that they were going to gain with this ordinance really didn't come to pass. Wouldn't the village still win on those facts because there's no evidence that they actively persuaded property owners to decline to renew their contracts with the alarm companies? They clearly said you could not contract with the alarm companies in the notice itself. It said that you have to terminate your relationship and contract to have fire alarm monitoring through Tyco to Northwest Central Dispatch, using the same transmitters that the alarm companies were using prior to the time the ordinance was adopted. So they were actually impairing that relationship intentionally, and the proof of that is from their own records that there was no system prior to 2016. As a result of the adoption of the ordinance, they got 1,200 accounts under their control, which is all the accounts in the village. So whoever had a contract up to that time lost the contract. See, I hate to keep going back to the facts, but you're talking about the notice document? I'm talking about the notice and the memo from the chief. And where do you see language saying that you must all contract with Tyco? Well, it doesn't say that. What it says is you must have a receiver from Tyco, and the only way you get a receiver from Tyco is terminating your contract with the alarm companies. See, this is where the ship's passing the night a little bit between both parties here because my sense is your adversary is going to say, as he did in his brief, that the alarm companies can continue to service, maintain, and provide equipment so long as there's direct transmission to this NWCDS group. That's a total misstatement because the receiver is a key piece of equipment between the facility and Northwest Central Dispatch. The receiver is the one that my clients were using up to the time the ordinance was adopted, but under the terms of the ordinance by the latest of August 31st of 2019, all those transmissions had to be made on Tyco equipment to Northwest Central Dispatch. Where do you see that language? In the notice itself. It's the three elements for termination. If you improve your system, if you have a new system, or August 31st of 2019. Yeah, see, okay, I don't want to hold you up. I'm looking at exactly what you're saying, and I don't see the part that you're adding about you must use Tyco equipment. Well, they misrepresent to the court the difference between the equipment and the premises. So the various parts of equipment in the premises, the monitors with respect to fire and smoke can't transmit to a panel. The panel then has to transmit through a transmitter to the 911 center. So your position is that if ADS had a box, and that box sent a direct signal to NWCDS directly, there's no go between, it doesn't go over here and then get routed over even within seconds, that if ADS went directly, that the ordinance bans that. It does. Okay. Because the receiver has to be the Tyco receiver, not an ADS receiver. So that's why the one key piece of equipment in the premises that has to change is the receiver, even though the receiver is the identical piece of equipment that ADS and the other alarm companies use. And that's the failure of the system, because by giving that situation, the transmitter becomes Tyco's property, and the necessity of getting information about the systems that are out of service is lost. And that's what we point out. And Mr. Boniface's affidavit did a study of a year and a half of alarm systems that were out of service in the village, and he found that many of them were out of service for weeks or months, that there was no protocol. And this was confirmed by the fire marshal. There's no protocol when a system is out of service of notifying the monitoring company, the company that has the equipment, not the monitoring company, the company having the equipment in the premises to repair it. And as a result, these systems go out of service for long periods of time, compared to the alarm companies who do it in a day or two at the most, and have a 1% to 2% out of the services compared to 6% to 7%. Okay. You want to save your remaining time for rebuttal?  Okay. Very well. You're from Mr. Jablokie, right? Yes. Good morning. May I please the Court? Good morning, Your Honors. Again, my name is Howard Jablokie. I represent the village. I must start today by saying it's absolutely thrilling to see so many people interested in alarm monitoring and municipal ordinances, so it's a nice hooray, a sober morning. But to get right into the facts of this, and Your Honors have touched on this, a lot of the issues already, the district court properly considered the facts and evidence in ruling on the motions, cross motions for summary judgment and the motion to reconsider, and found that there simply was no evidence to support a substantial impairment to support an alleged violation of the contracts clause. Well, let's zoom out a bit, though. So now NWCDS has this exclusive contract with Tyco. Doesn't it effectively mean that the alarm companies can't do business in Schaumburg? Because the property owners, you know, eventually which ones would choose to maintain their existing contracts with these alarm companies, knowing that they have to pay an additional, I think it's $81 on top because of the Tyco receiver situation. You know, I understand the concern you have, but that's not the question that's at issue. You have to look at the logic. Well, that's my question. No, I understand that. And that's not the facts. That's not the facts of the case. The alarm companies can still, they still have the equipment on. It's just, it's the, whatever North Central Dispatch's arrangement is, which was before the court the previous time up with their contract with Tyco and this court rejected any issues with that. They can still maintain business with the systems on the property. It's simply the ordinance requires a direct connect to. That is my question. That direct connect required by the ordinance means an additional payment on top of any service that they're already maintaining. To Northwest Central. Yes. They would not have the additional payment if they just scrap their contracts with the alarm companies and deal with Tyco only. They would have a payment for the transmitting. And again, whether this is in the record is at question, but they would have a payment for the transmittal, the monitoring to Northwest Central, and then they would pay whatever to the alarm companies to maintain their systems on premises. So they'd still be paying for monitoring one way or the other, whether it's through Tyco to Northwest Central or it's where it's through the alarm companies. If they deal with Tyco only, they don't have that additional payment. They have their base rate for their monitoring services if they choose to go only through Tyco. If they keep their existing contracts, they've got to pay their existing vendor plus $81 for Tyco. Potentially, yes. That's my question. And that's not an issue when it comes to the contract clause analysis and whether there's a substantial impairment in their existing contracts. Because what courts look to is, you know, is there a substantial impairment on an existing contract? And courts have routinely held that a municipality, a local government, can enact legislation that affects those rights when it promotes a public interest, public safety and welfare. And that's exactly what we have here. So any unintended effect of improving that public health and safety concern is not, and this court said it itself in its last opinion, this is something that the contract clause is simply not concerned with. If it's not relevant to the contract clause, why wouldn't it be relevant to the intentional aspect of the torches interference with prospective economic advantage? I think the answer to that is simple, is that there was no intent to impair any contracts. There was no intent to do anything. The village's intent, the village's rationale for action was public safety. And that's supported by everything in the record. But if they're requiring customers to pay more money, or if a result of what they're doing would require customers to pay more money, why wouldn't that support that their action was intentional against the alarm companies? Because the requirement isn't for them to pay more money. I understand that that might be an unintended effect based on Northwest Central's contract with Tyco, which the village has no control over. But I also think there's no evidence in the record to show what the difference in payment is between a full service now and a full service then. And that's the issue. And you were getting into all of these things that are not fleshed out in the record. And the district court said there is not sufficient evidence in it. And I think your honors have noted too, that there's nothing in the record to support any direct substantial impairment with which the contract clause is concerned. No, but on this torches interference with prospective economic advantage, I do think we have to pay attention to the, the standard is both intentional and unjustified. And the intent talks about, you know, persuading, controlling, inciting. We do have to think about the question about, you know, an ordinance, a law is fundamentally coercive, you know, but people have to comply with an ordinance. So why wouldn't that to go back to judge CNA's question, why wouldn't that satisfy, you know, an intentional nudging of alarm companies to, to make a choice, to make an economic choice, to comply with the ordinance, the economic choice for them would be to just deal with Tyco only going forward, not renew their contracts. For the customers, the clients, not the alarm companies themselves, potentially true, but the analysis is intentional and unjustified. Right. And so you're saying we should skip to the unjustified part. Well, I think that you don't need to skip there because it wasn't intentional. I mean, the record is clear that the intent of the village was not to impair contracts. And this is what the district court said in its opinion. The intent was to promote public health and safety. That's clear. That's in all of the records. So there was no direct intent. If there was a consequence that doesn't impact, impact the intent of the village and passing the ordinance. And then when you look at whether it was justified, you go back to the public safety measures that again, that play into that second prong of the contract clause analysis, but also play into the tortious interference. Where is there a justification for the ordinance? And that's clear in the record. It's undisputed. There's testimony from the fire marshal as to the increased response times. And I want to touch on, you know, council spends a lot of time in their briefs and he mentioned it again today, talking about, you know, all of these alarms that are out of service. And that's really a distraction from the issues here, because the issue is before, before the ordinance was passed, this is under the contract clause analysis or the justification for the tortious interference claims, before the ordinance was passed, the village, and this is in the record, for two years, they were finding alarm systems out of service at large commercial, large multifamily dwellings that the village had no knowledge of. So they were doing a routine inspection, finding that alarm systems were completely out of service. And now under the ordinance, the village gets a report every day that shows the alarms that are out of service. Again, the village doesn't maintain those, but now they have the knowledge that, Hey, we know this, this property over here, their alarm has an issue. So we have extra watch on it. We can put them on a fire watch to make sure that the public health and safety is insured. So it's not about the, the number of alarms that are out of service. We don't have the information before the ordinance for the number of alarms that were out of service, but we do know that the village had no knowledge of it. And that's the important public safety justification here is that now the village is getting that information on a daily basis so that they know, Hey, we have a property over here that their alarm system isn't working. That promotes public health and safety because they have, they can be aware of that. They can act accordingly. They can do what's necessary to protect public health and safety and  Mr. Jablonski, what's the, what's the evidence show in your view about whether there were any early terminations as opposed to a failure to renew? I think the district court was right that there was no evidence there was, it was either hearsay for moral statements, or it was documents that lacked any foundation. And, and, you know, the district court noted there was the one notice that was attached to the complaint. That was a notice of non-renewal. And as this court mentioned, and this has been clear, you know, that that is not a vested right in the continuance of any contract. And so there really is no evidence. And I think that's, you know, even in the motion to reconsider, that's what the affluence were arguing to the court that you ignored this, you ignored that. And the court again went through it all and said that there is no evidence for purposes of summary judgment to support or to meet the, uh, the alarm company's burden to show a substantial impairment. Can I ask you a non-legal question? Sure. Why is there so much confusion after this much litigation is when we're sitting here right now about whether non Tyco equipment can be used? Uh, it seems, it's, it, it seems very odd to me that that you all are passing in the night to the Well, and I think it might, it might stem from a fundamental misunderstanding of what the ordinance requires. And the village has been clear from day one in this case, that the ordinance ever just had him forget the courthouse and just had a meeting. If the village's view is that ADS can do this, that ADS can put a box on a wall and that box can send a signal to NWCDS. Why don't you just meet and tell him that there was a meeting and this is in the, in the pleadings it's in, there was a meeting shortly after the ordinance was passed and the proposal from the alarm companies was to keep that middleman, to keep that, that, that transmission from a middleman to NWCDS and eliminate the direct. Cause they seem to be saying in their brief, this is where you're passing or this is what I mean where you're passing in the night. They seem to be saying it's absolutely impossible. It is 100% impossible for ADS to continue to provide alarm services in accordance with this ordinance. It is mandated that Tyco be the alarm company. And that's, I think that's, that's where there is confusion because the village is the same way that the ordinance doesn't say you have to contract with Tyco. The ordinance doesn't say that you can't provide services. The ordinance simply says you have to direct connect to the village's designated supervisory station upon the expiration of contracts upon the, the replacement or new equipment or by August 31st of 2019 with an additional two year extension for contracts that hadn't expired by then. And that's the ordinance. That's what the ordinance says. Are there any residents that don't use Tyco equipment that use an outside alarm company and don't use Tyco equipment still? The village does not have that knowledge and it's definitely not in the record, but that's not information that the village would have because the village doesn't, the village isn't involved with what equipment is at what, you know, at what property. Certainly something that could have come up in discovery here. It could have, it simply didn't. And it wouldn't have, it wouldn't be information that the village has. Nor do I think it's important to the overall analysis because when circling back to the contract clause, you know, there simply is no evidence of substantial impairment and importantly you know that the district court noted this in their opinion as well, that the contract clause is not violated every time a municipality passes legislation that affects a business model or causes a loss of future business. And I think that's important to look at because this is not the situation that the contract clause is concerned with. Again, you know, this court expressly stated in its opinion in the first time this was up that this is not a totally unanticipated and substantially retroactive change in law, which the contract clause is concerned. And it's the, it's on the burden of the alarm companies to show substantial impairment and they simply have failed to do so. It's been noted that there simply is, you know, they try to jump from point A to point C without getting the facts in B to prove point C. And that's the issue here. And that's what the district court noticed. And that's what your honors have keyed into this morning as well. Was there anything that prevented them in the district court from coming in with an affidavit from a customer saying I'm customer A, I'm aware of the Schomburg ordinance and I terminated my contract early? I mean, hypothetically, no. I mean, if they were to come in with, with an affidavit that met the requirements of rule 56 and, and, you know, Just open discovery, right? Correct. And we don't have that. We don't have, we have, you know, self-serving conclusory statements from the plaintiffs themselves, but there is no, as the district court noted, there is no direct evidence of any early termination of contracts and therefore no evidence of substantial impairment. Were any customers deposed? No, they were not. And the important thing to note too, again, you know, you have substantial impairment and the district court relied on substantial impairment to make that decision correctly. I do believe. But even, even if there is some question about substantial impairment, then you go to the ordinance itself. And is it reasonable? And does it support a legitimate public interest? And that's where again, public safety comes in. There's no doubt. The village of Pinsdale case expressly said, and it dealt with a contract clause claim and it said, you know, increased response times, increased reliability, increased communications. That is all a legitimate public interest to support fire prevention, fire control for the village. And so I think even, even if you jump over a substantial impairment, they're still supported by prior opinions. There's a legitimate public interest to support the passage of the ordinance and thereby we'd ask that the district court's decisions be affirmed. Okay. Further questions. Okay. Very well. Thank you for your time. Mr. Goldsmith, we'll give you a couple of minutes here. So to your point about ships passing the night, the village just doesn't understand the alarm business, the transmitters. That's why I really, sometimes this stuff's better resolved outside of courthouses. They don't want to resolve it. What time can we meet your honor? In my history of involvement in this industry, no governmental unit has ever agreed to just sit down and meet because they want the revenue. We tried early in the game, ask him out in the hallway. I'm happy to do that when this is over, but the, the fact of the matter is that the ordinance said the installation of the radio will be performed by Tyco along with the necessary programming. It also said that Tyco is the authorized installer of the receiver. That trend, I'm sorry, retransmit, that transmitter is the key to this whole case. So if you have the transmitter, you have the business. If you don't have the transmitter, you're out of the business. And they knocked us out of the business. And that's why we have no customers. And to your point, uh, it's quite clear that, uh, we can't restore customers where we have no ability to sell them service without being able to monitor. We can't sell the other services. And that's in the affidavits. But beyond that, uh, it's important to know that they didn't achieve any good result as a, as a result of this ordinance. They made the provision of fireline monitoring inferior to what any alarm company would do because they do not take the information. Evidence of that though. I know, I know that that's your argument. Mr. Bonoffice who has four years of experience and, uh, would be considered an opinion witness if this were a trial, uh, testified to the fact that he reviewed a year and a half of records of certain systems out of service. And he found that they were not providing service within sometimes weeks or months of when the service was in limbo. And that's, that's damaging. And that's, uh, it's, it's a ridiculous situation for them to adopt an ordinance that actually diminishes the quality of, of the, uh, provision of service. And in that regard, whether you think there's enough evidence with respect to the contract clause with regard to the tortious interference claims, it's quite clear that they have substantially interfered because they now have 1,200 accounts and we have zero and we have no ability to provide new business. And that's in the affidavits as well. So from that standpoint, uh, then you have a business model, which gives them 300,000 or more of revenue a year, but you have no improvement in public safety. In fact, we have a diminishment in public safety. Okay. Um, Mr. Goldsmith, thank you very much. Mr. Jablocki will take the appeal under advisement. We appreciate the argument of both council. Thank you.